IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NATHAN ROBERTS, et al.,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>PROGRESSIVE PREFERRED INSURANCE COMPANY, et al.,<br>    *Defendants.* | Civil Action No. 1:23-cv-01597<br><br>JUDGE PATRICIA A. GAUGHAN<br>Magistrate Judge James E. Grimes, Jr. |

**BRIEF OF SOUTHERN POVERTY LAW CENTER, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, HISPANIC NATIONAL BAR ASSOCIATION, AND ASIAN AMERICANS ADVANCING JUSTICE – AAJC AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

1

**TABLE OF CONTENTS**

**INTEREST OF *AMICI CURIAE*** ................................................................................................ 1

**ARGUMENT** ................................................................................................................................ 2

    I. Congress Enacted the Civil Rights Act of 1866 and Section 1981 to Realize the Goals of Black Emancipation. ................................................................................................. 3

    II. Section 1981 Sought to Ensure Basic Economic Rights for Black Citizens. ............... 4

    III. Weaponizing Section 1981 to Impede Private, Remedial Philanthropy That Supports Black Economic Mobility Perverts Congressional Intent. .............................................. 7

    IV. Applying Section 1981 to Prohibit Remedial Philanthropy Would Hinder Black People's Ability to Participate Equally in the Economy. ............................................ 10

**CONCLUSION** ................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  No. 23-13138 (11th Cir.) ..................................................................................................11

*American Alliance for Equal Rights v. Fearless Fund Management, LLC*,
  2023 WL 6520763 (11th Cir. 2023) ................................................................................6, 7

*CBOCS W., Inc. v. Humphries*,
  553 U.S. 442 (2008)..............................................................................................................6

*City of Memphis v. Greene*,
  451 U.S. 100 (1981)..............................................................................................................5

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020).........................................................................................................1

*Crooks v. Ray*,
  815 F.2d 76 (6th Cir. 1987) .................................................................................................8

*Doe v. Kamehameha Schs.*,
  470 F.3d 827 (9th Cir. 2006) .......................................................................................7, 8, 9

*Gen. Bldg. Contractors Ass'n Inc. v. Pennsylvania*,
  458 U.S. 375 (1982)..............................................................................................4, 5, 7, 8

*Goodman v. Lukens Steel Co.*,
  482 U.S. 656 (1987), *superseded on other grounds by statute* Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) ..............................................5, 9

*Johnson v. Transp. Agency, Santa Clara Cnty.*,
  480 U.S. 616 (1987)..............................................................................................................9

*Jones v. Alfred H. Mayer Co.*,
  392 U.S. 409 (1968)..........................................................................................................4, 6

*Jones v. R.R. Donnelley & Sons Co.*,
  541 U.S. 369 (2004)........................................................................................................5, 10

*McDonald v. Santa Fe Trail Transp. Co.*,
  417 U.S. 273 (1976).............................................................................................................8

*Murray v. Thistledown Racing Club, Inc.*,
  770 F.2d 63 (6th Cir. 1985) .................................................................................................8

*Patterson v. McLean Credit Union*, 491 U.S. 164, 219 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, *as recognized in CBOCS W., Inc., v. Humphries*, 553 U.S. 442, 450 (2008) .........................................7

*Regents of Univ. of California v. Bakke*,
    438 U.S. 265 (1978)................................................................................................5

*Runyon v. McCrary*,
    427 U.S. 160 (1976)................................................................................................7

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    143 S. Ct. 2141 (2023)............................................................................................1

*United Steelworkers of Am. v. Weber*,
    443 U.S. 193 (1979)................................................................................................9

**Statutes**

42 U.S.C. § 1981................................................................................................ *passim*

42 U.S.C. § 1981(a) .......................................................................................................6

Civil Rights Act of 1866............................................................................................ *passim*

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 ........................................7

Enforcement Act of 1870, May 31, 1870, ch. 114, 16 Stat. 140 ......................................5

Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114.................5, 9

**Other Authorities**

Alicia Robb, Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms 12 Off. of Advocacy, U.S. Small Bus. Assoc. (Feb. 2018)..............................................................................10

America First Legal, https://aflegal.org/about/ (*last visited Dec. 17, 2023*)..................8

Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 Yale L.J. 541, 549 (1989)....................................3

Danielle Tarantolo, *From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 Yale L.J. 170, 186–87 (1) ............................................................................................3, 4

Elana Dure, *Black Women are the Fastest Growing Group of Entrepreneurs. But The Job Isn't Easy* (J.P. Morgan Oct. 12, 2021)....................................................10

Eric Foner and Olivia Mahoney, *America's Reconstruction: People and Politics after the Civil War* 74–79 (Harper 1995) ................................................................. 4

Eric Foner, *Rights and Black Life in War and Reconstruction*, 74 J. of Am. History 863, 871 (1987) ............................................................................................. 3

Herman Belz, *Emancipation and Equal Rights: Politics and Constitutionalism in the Civil War Era* 63 (W.W. Norton & Co. 1978) ........................................................ 4

Majority Staff Report, Women's Small Business Ownership and Entrepreneurship Report, U.S. Senate Comm. on Small Bus. and Entrep. 6 (July 2023) .................. 10

Ohio Constitution of 1802 ............................................................................................... 5

*Racial Discrimination in Employment under the Civil Rights Act of 1866*, 36 U. Chi. L. Rev. 615, 619 (1969) ...................................................................................... 6

Rebecca E. Zietlow, Slavery, Liberty, and the Right to Contract, 19 NEV. L.J. 447, 448 (2018) ........................................................................................................... 7

Robert J. Kohl, *The Civil Rights Act of 1866, its Hour Come Round at Last: Jones v. Alfred H. Mayer Co.*, 55 Va. L. Rev. 272, 279 (1969) .......................................... 6

S. Exec, Doc. No. 2, 39th Cong., 1st Sess. (1865), reprinted in The Reconstruction Amendments' Debates 88 (Virginia Comm'n on Constitutional Government (1967) .......................................................................................................................... 4, 6

Stephen Middleton, *The Black Laws: Race and the Legal Process in Early Ohio*, 2-3 (Ohio University Press 2005) ............................................................................... 5

Sullivan, 98 Yale L.J. ................................................................................................ 3, 4, 6, 7

W.E.B. DuBois, *Black Reconstruction in America, 1860–1880* 67 (Atheneum 1962) ............................................................................................................................ 3

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are the Southern Poverty Law Center ("SPLC"), the Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee"), the National Hispanic Bar Association ("NHBA"), and Asian Americans Advancing Justice – AAJC ("Advancing Justice – AAJC"). **SPLC** is a nonprofit 501(c)(3) civil rights organization that is a catalyst for racial justice in the South and beyond, working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people. SPLC has participated as counsel or *amicus curiae* in a range of cases before the U.S. Supreme Court, federal appellate and district courts, and state courts in its efforts to secure equal treatment and opportunity for marginalized members of society.

Formed in 1963, the **Lawyers' Committee** is a nonpartisan, nonprofit organization that uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. To this end, the Lawyers' Committee has participated in hundreds of cases involving issues related to voting rights, housing, employment, education, and public accommodations. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020).

**HNBA** has a membership comprised of thousands of Latino lawyers, law professors, law students, legal professionals, state and federal judges, legislators, and bar affiliates across the country. The HNBA regularly participates as *amicus curiae* in courts across the country, including

---

[1] The Parties have consented to the filing of this brief. No counsel to a party in this case authored this brief in whole or in part. No party or party's counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief. No person or entity other than *amici* and their counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief.

1

in civil rights and constitutional cases of importance to the millions of people of Hispanic heritage living in the United States.

**Advancing Justice-AAJC** is a national nonprofit organization based in Washington, D.C., and founded in 1991. Advancing Justice-AAJC works to advance and protect civil and human rights for Asian Americans and to promote an equitable society for all. Advancing Justice-AAJC is a leading expert on issues of importance to the Asian American community, including educational equity and opportunities, voting rights, immigrant rights, racial profiling, and the decennial census. Advancing Justice-AAJC works to promote justice and bring national and local constituencies together through community outreach, advocacy, and litigation.

*Amici*'s interest in this litigation stems from their missions to combat structural racism and the present-day remnants of historical racial oppression. This information will aid the Court in considering the genesis of the Civil Rights Act of 1866 and 42 U.S.C. § 1981 ("Section 1981") within the context of this lawsuit.

## ARGUMENT

Drawing on their expertise and experience furthering racial justice, *amici* submit this brief to draw the Court's attention to the historical context and purpose of Section 1981 as a post-slavery remedial law to open opportunity to Black Americans and increase their economic mobility. Through this case, Plaintiffs attack a private philanthropic grant program administered by Progressive and Hello Alice that seeks to increase access to funding for Black businesses, funding that is severely disproportionate along the lines of race. Plaintiffs' perversity in weaponizing this country's long-standing commitment to equalizing economic opportunities for Black business owners is antithetical to and outside of the scope of Section 1981's congressional purpose.

### I. Congress Enacted the Civil Rights Act of 1866 and Section 1981 to Realize the Goals of Black Emancipation.

Plaintiffs' suit attempts to undermine the very goal that Section 1981 aimed to advance: providing Black people with economic freedom and opportunity. In the wake of the passage of the Thirteenth Amendment, formerly enslaved individuals working in the South sought to achieve the "greatest possible measure of economic autonomy." Eric Foner, *Rights and the Constitution in Black Life in War and Reconstruction*, 74 J. of Am. History 863, 871 (1987). The "desire to escape from white supervision" and establish economic independence led them to seek land of their own and achieve a measure of political power, which included "access to the South's economic resources, equal treatment in the courts, and protection against violence." *Id*. at 871–72; *see also* W.E. Burghardt Du Bois, *Black Reconstruction in America, 1860–1880* 67 (Atheneum 1962) (freed Black workers "wanted land to work, and they wanted to see and own the results of their toil . . . All they needed was honesty in treatment, and education."). Despite the formal abolition of the institution, the social and structural "'badges and incidents' of slavery" stymied the efforts of emancipated Black workers and entrepreneurs. Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 Yale L.J. 541, 549 (1989).

In December 1865, Major General Carl Schurz issued a report that catalyzed the debates that led to the drafting of the Civil Rights Act of 1866 and which described the widespread use of "Black Codes" to hamper true Black economic emancipation.[2] Sullivan, 98 Yale L.J. at 549-50. These infamous statutes, adopted between 1865 and 1866 in southern states, deliberately restricted the civil liberties of formerly enslaved persons, *see* Du Bois, *Black Reconstruction* at 166–68, and simultaneously sanctioned white people's refusal to do business with them, *see* Danielle Tarantolo,

---

[2] President Johnson sent General Schurz to investigate the conditions in the South. However, upon reading the report, Johnson did not approve of its contents describing the violence that continued against Black people in the region. Sullivan, 98 Yale L.J. at 553 n. 78.

*From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 Yale L.J. 170, 186–87 (1). The Codes closely regulated labor; they limited the type of employment that individuals could choose and introduced criminal penalties for "vagrancy," or periods of unemployment. *Id.; see also* Eric Foner and Olivia Mahoney, *America's Reconstruction: People and Politics after the Civil War* 74–79 (Harper 1995).

Schurz looked to these Codes as evidence that the federal government had failed in its completion of the "great social revolution" anticipated by emancipation, because "free labor ha[d] not yet" truly supplanted the institution of slavery in the South. S. Exec. Doc. No. 2, 39th Cong., 1st Sess. 38 (1865) ("Report on the Condition of the South"). He described the prevailing, racist view that the reason Black men were not provided the opportunity to work was because they did not want to work, when in fact, the "free labor experiment" had failed to provide them with the avenues or opportunities to participate in the economy freely. Report on the Condition of the South, reprinted in The Reconstruction Amendments' Debates 88 (Virginia Comm'n on Constitutional Government (1967); *see also Gen. Bldg. Contractors Ass'n Inc. v. Pa.*, 458 U.S. 375, 411. Even prior to the Thirteenth Amendment's passage, Senator Lyman Trumbull of Illinois was adamant that stronger federal legislation should be adopted to overcome the Black Codes, particularly since "men whose liberties are secured by [the Thirteenth Amendment] are deprived of the privilege to . . . buy and sell when they please, to make contracts and enforce contracts . . . " Cong. Globe, 39th Cong., 1st Sess., 43; *see also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 430 (1968). By the end of 1865, mainstream Republicanism had aligned with the campaign for affirmative civil rights for formerly enslaved people. Sullivan, 98 Yale L. J. at 549; *see also* Herman Belz, *Emancipation and Equal Rights: Politics and Constitutionalism in the Civil War Era* 63 (W.W. Norton & Co. 1978).

**II. Section 1981 Sought to Ensure Basic Economic Rights for Black Citizens.**

The 39th Congress recognized that the Thirteenth Amendment alone could not remedy the ongoing barriers preventing opportunities for Black people to meaningfully participate in the economy, and it decided to take further action. *See City of Memphis v. Greene*, 451 U.S. 100, 131 (1981) (White, J. concurring). Section 1981 and the Civil Rights Act of 1866, along with the Thirteenth Amendment and the later passage of the Fourteenth Amendment and the Enforcement Act of 1870, were "all products of the same milieu and were directed against the same evils" — eroding the remaining structural barriers in place that prevented Black citizens from having equal access to participate in the economy. *Gen. Bldg. Contractors Ass'n, Inc. v. Pa.*, 458 U.S. 375, 391, 410 (1982) (Marshall, T., dissenting).

When Ohio became the Union's seventeenth state in 1803, its government had to "reconcile[e] the ideal of the republic with the history of American slavery and legalized discrimination." Stephen Middleton, *The Black Laws: Race and the Legal Process in Early Ohio*, 2-3 (Ohio University Press 2005). "From the territorial period in the mid-1780s through [] early [1804], Ohio enacted a category of legislation" ("Black Laws"), which "had one specific objective: to make life for [those fleeing slavery] in Ohio so intolerable that these men and women would not use the free state as a refuge from [] oppression []." *Id*. at 3.[3]

However, it was the Black Codes enacted by southern states and the acts of private discrimination and violence against Black individuals that solidified the need for legislative action.

---

[3] Although Ohio's constitution of 1802 sought "to establish justice, promote the welfare and secure the blessings of liberty to ourselves and our posterity," its history was rooted in anti-Black racism. *Id*. It took 83 years to repeal this "system of 'laws which imposed upon the [Black] race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value.'" *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 390 (1978) (quoting *Slaughter-House Cases*, 16 Wall. 36, 70 (1873)). Other northern states also had a history of enacting Black Codes. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 672-73 n. 3 (1987), *superseded on other grounds by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) (Brennan, J., dissenting). "The Black Codes had 'attenuated counterparts' in some Northern States, usually 'prohibiting the ingress of blacks into the state, imposing Jim Crow in public facilities, or prohibiting blacks from voting.'" *Id*. (quoting Harold Hyman and William Wiecek, *Equal Justice Under the Law: Constitutional Development 1835-1875* at 320 (Harper, 1982)).

5

*See* Sullivan, 98 Yale L.J., at 549. While Congress used the term "contracts" without limitation in the Act, early debates focused in detail on the evidence presented by Schurz and, specifically, on the employment contract. *See Racial Discrimination in Employment under the Civil Rights Act of 1866*, 36 U. Chi. L. Rev. 615, 619 (1969). Early supporters explained that denying equal economic access to formerly enslaved individuals would make a "mockery" of emancipation, Cong. Globe, 39th Cong, 1st Sess., 1833 (1866) (Statement of Rep. Lawrence), and described the bill's "object" as a means of providing "a poor, weak class of laborers the right to make contracts for their labor, the power to enforce the payment of their wages, and the means of holding and enjoying the proceeds of their toil," *id.* at 1159 (Statement of Rep. Windom). Thus, the Act's purpose was rooted in economic freedom for Black people to enforce contracts.

Section 1981 granted emancipated Black citizens basic economic rights. 42 U.S.C. § 1981; *See Am. Alliance for Equal Rts. v. Fearless Fund Mgmt., LLC*, 2023 WL 6520763 at *3 (11th Cir. 2023) (Wilson, C., dissenting). The bill's text ensured formerly enslaved individuals had the right to "make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws," specifying that those benefits should be the same as those "enjoyed by white citizens." 42 U.S.C. § 1981(a). The enshrinement of these rights would "enable them to act as autonomous, productive workers," and, in turn, "accumulate some material wealth." Sullivan, 98 Yale L. J. at 550; *see also* Robert J. Kohl, *The Civil Rights Act of 1866, its Hour Come Round at Last: Jones v. Alfred H. Mayer Co.*, 55 Va. L. Rev. 272, 279 (1969); *Am. Alliance for Equal Rts. v. Fearless Fund Mgmt., LLC*, 2023 WL 6520763 at *3 (11th Cir. 2023) (Wilson, C., dissenting). The language of the statute reflects Congress's recognition that, up to that point, white people were afforded a privileged standing under the law, and that moving forward, that standard would now be the baseline for Black citizens too. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448 (2008) (Section

1981 "represent[ed] . . . a[] legislative effort to guarantee the then newly freed slaves the same legal rights that other citizens enjoy."); *see also* Rebecca E. Zietlow, Slavery, Liberty, and the Right to Contract, 19 NEV. L.J. 447, 448 (2018) (The Reconstruction Congress saw that "freedom of contract was not an end in itself; it was a means to the end of achieving equal citizenship and fundamental rights for freed slaves[.]").

### III. Weaponizing Section 1981 to Impede Private, Remedial Philanthropy That Supports Black Economic Mobility Perverts Congressional Intent.

Given Congress's motivation in the 1800s to protect Black citizens from white citizens "whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices," *Doe v. Kamehameha Schs.*, 470 F.3d 827, 836 (9th Cir. 2006) (en banc) (internal citations omitted), Section 1981 should not now be weaponized in 2023 to challenge remedial philanthropic programs aimed at providing opportunities for Black business owners who face greater barriers in accessing funding *See, id*. Justice Stevens aptly warned his colleagues not to run afoul of "the secure foundation [] laid by others who had gone before [them]" when the Court failed to follow *Runyon v. McCrary*, 427 U.S. 160, 191 (1976), to interpret "the right 'to make and enforce contracts' as a guarantee of equal opportunity, and not merely a guarantee of equal rights." *Patterson v. McLean Credit Union*, 491 U.S. 164, 219 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, *as recognized in CBOCS W., Inc., v. Humphries*, 553 U.S. 442, 450 (2008) (Stevens, J., dissenting). After lying practically dormant for over a century, "[i]t would indeed be [] ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminat[ion]. . . ." *Doe v. Kamehameha Schs.*, 470 F.3d at 838 (citing *Setser v. Novack Inv.*

*Co.*, 657 F.2d 962, 966 (8th Cir. 1981)). And yet that is precisely the aim at the heart of this action: to undo decades of progress in this regard.[4]

As detailed *supra*, Section 1981 aimed to empower Black citizens to gain the economic power they were deprived of following centuries of anti-Black discrimination and the aftermath of slavery and was never intended to serve as a vehicle to cut back private, remedial measures that serve to further Black economic opportunity. The seminal cases interpreting Section 1981 highlight this history and purpose. While it is recognized that Section 1981 "prohibits racial discrimination against all groups," the Sixth Circuit has explained that "the majority plaintiff who asserts a claim of racial discrimination" must still do so "within the historical context of the Act." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 417 U.S. 273, 295 (1976)).[5]

Furthermore, Section 1981 explicitly governs contractual relationships and was not intended to apply to private philanthropy like the one at issue in this case. *See Doe v. Kamehameha Schs.*, 470 F.3d 827, 889 (9th Cir. 2006) (en banc) (Kozinski, J., dissenting) (noting "no case[s] where section 1981 has been applied to a charity" and where, absent tuition, the concept of "contractual" relationships would be set aside). In reaching its decision that an admissions policy specifically earmarked for Native Hawaiians complies with "the spirit" of Section 1981, the Ninth Circuit followed the practice of its sister circuits in applying Title VII principles to Section 1981 claims. *Id*. at 838–46. Specifically, finding that Section 1981 "does not bar affirmative action programs, even in light of *McDonald*," the *Doe* court recognized an analogous framework for

---

[4] *See, e.g.*, American First Legal, https://aflegal.org/about/ (last visited Dec. 20, 2023). America First Legal touts a track record of litigation it has filed seeking to dismantle remedial measures that benefit Black Americans. https://aflegal.org/litigation/ (last visited Dec. 17, 2023).
[5] *See also Crooks v. Ray*, 815 F.2d 76 (6th Cir. 1987) ("In an action based upon section 1981, plaintiffs must demonstrate that defendants intentionally placed more stringent requirements on them because of their race." (citing *Murray*, 770 F.2d at 69; *Gen. Bldg. Contractors Ass'n Inc. v. Pennsylvania*, 458 U.S. 375 (1982))).

8

private secondary schools. It held that "Title VII does not bar all preferential treatment on the basis of race" and that "[t]o open the door for such plans under [T]itle VII and close it under section 1981 would make little sense.*" See id.* (internal citations and quotations omitted). In fact, bolstered by the Supreme Court's decision in *United Steelworkers of Am. v. Weber*, 443 U.S. 193 (1979), *Doe* relied on the "implicitly approved [] use of race-conscious plans to remedy past discrimination under section 1981" to "modify" the "*Johnson* factors" to fit "the context of the case." *See id.* at 838, 841 (citing *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616 (1987)). This Court should not "close the door" to charitable economic programs designed to "take[] into account the inherently broad and societal focus" of correcting "present, demonstrable disparities in [financial] achievement[s].*" Id.* at 842. *Amici* encourage this Court to consider the principles set out in *Doe* to find that Section 1981 does not preclude remedial racial preferences in the application of private, remedial philanthropy.

Plaintiffs' suit aims to use Section 1981—a statute intended to concretize the promises of the Thirteenth Amendment—to cut back private, philanthropic measures intended to further racial justice. This Court should be wary of Plaintiffs' attempt to use Section 1981 and the Judiciary to unravel the growth of opportunity for minority business interests on the basis of race. Instead, this Court should stand guard against "'the formidable hand of custom' [that] interposed itself between [B]lacks and economic independence," *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 673 (1987), *superseded on other grounds by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) (Brennan, J., dissenting), and refuse Plaintiffs' attempt to turn back time to resurrect the "central concerns in 1866" which "consigned [B]lack Americans to lives of perpetual economic subservience to their former masters." *Id.* at 674.

9

## IV. Applying Section 1981 to Prohibit Remedial Philanthropy Would Hinder Black People's Ability to Participate Equally in the Economy.

Congress' intent to abolish "all badges and incidents of slavery" under Section 1981 is just as important today as it was during the height of the Black Codes. And expanding, rather than shrinking, market access to historically and currently excluded groups is as central to Section 1981's design today as when it was first passed.

Market access is not equal among all racial groups in this country. Venture capital provides a stark example. In recent research studies, the Small Business Administration ("SBA") has found continued disparities in racial minorities' ability to access capital. Alicia Robb, Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms 12 Off. of Advocacy, U.S. Small Bus. Assoc. (Feb. 2018). For example, the SBA found that although Black Americans are 13.2% of the population, they own only 2.1% of employer businesses. *Id.* at 8. It also noted that 70.6% of Black Americans commonly relied on personal or family savings for start-up capital, and only 15.2% depended on business loans. *Id.* at 15–16. A greater dependence on personal or family savings is due, in part, to the fact that Black businesses face a funding rejection rate three times higher than their white counterparts. Elana Dure, *Black Women are the Fastest Growing Group of Entrepreneurs. But The Job Isn't Easy* (J.P. Morgan Oct. 12, 2021); *see also* Majority Staff Report, Women's Small Business Ownership and Entrepreneurship Report, U.S. Senate Comm. on Small Bus. and Entrep. 6 (July 2023) (affirming same). Due to this lack of access to funding to grow their businesses, only 4% of Black-owned businesses survive the start-up stage. McKinsey Institute for Black Economic Mobility, Building supportive ecosystems for Black-owned US businesses (Oct. 29, 2020). Similarly, a research study by Goldman Sachs found that, in comparison to a quarter of white business owners, more than half of Black business owners who sought credit reported receiving less than the amount they requested from financial

10

institutions. Gizelle George-Joseph and Daniel Milo, *The Bigger Picture Black Womenomics—Equalizing Entrepreneurship* at 3 (Feb. 9, 2022). Minority-owned firms with good credit scores are less likely than white-owned firms to receive the funding they need; thus, such disparities cannot be attributed to economic performance or creditworthiness alone. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,* No. 23-13138 (11th Cir.) Brief of Black Economic Alliance Foundation et al. as Amicus Curiae, p. 8, ECF Docket No. 90.

On the other hand, the vast majority of venture capital financing goes to white-owned businesses. The reported percentage of venture-capital funding going to Black-owned businesses remains steadily in the low single digits. *Id*. Though about 10% of U.S. companies are Black-owned, the percentage of Black venture capital funding has not surpassed 5% in the past six years, *id.,* and it has recently declined. "In the first half of 2023, venture-capital-backed startups raised $75 billion, but only 0.75% of those funds were invested in startups with Black founders." *Id.*, Brief of Amici Curiae National Venture et al., p. 10, ECF Docket No. 77.

In their crusade against racial equity—and as a putative class action, no less— Plaintiffs myopically ignore the history of discrimination and ongoing structural racism that causes such disparities. Indeed, Plaintiffs seek to force Progressive and Hello Alice to open their grant program to individuals who are from the group that has so far received 98% of all venture capital funding in 2023. Finding a private, philanthropic program that *increases* Black entrepreneurs' access to funding unlawful under Section 1981 would exacerbate inequitable economic access currently faced by Black communities.

## CONCLUSION

For the reasons stated herein, *Amici* respectfully submit that the history and Congressional intent behind The Civil Rights Act of 1866 and Section 1981 was never meant to prohibit private,

remedial philanthropy. A decision from this Court in favor of Plaintiffs would unjustifiably exacerbate the economic harm Black business owners experience in our society and would threaten to roll back progress that has been accomplished through similar remedial, private philanthropic programs. This Court should not incentivize businesses to weaponize Section 1981 in this manner —doing so would be wholly inconsistent with Congressional intent and the plain language of section 1981.

Respectfully submitted,

/s/
Jon Greenbaum
Dariely Rodriguez*
Kathryn J. Youker*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
jgreenbaum@lawyerscommittee.org
drodriguez@lawyerscommittee.org
kyouker@lawyerscommittee.org

/s/ Keith Harrison
Keith Harrison*
Amy M. Pauli*
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
O +1.202.624.2500
F +1.202.628.5116
Email: KHarrison@crowell.com
Email: APauli@crowell.com

*Pro hac vice* applications forthcoming

*Counsel for Proposed Amicus Curiae Lawyers' Committee for Civil Rights Under Law*

/s/ *Efrén C. Olivares*
Efrén C. Olivares*
Southern Poverty Law Center
150 E. Ponce De Leon Avenue, Suite 340
Decatur, GA 30030
Phone: 404-821-6443
Email: efren.olivares@splcenter.org

*Pro hac vice* application forthcoming

/s/ *Leslie Faith Jones*
Leslie Faith Jones*
Andrea Alajbegovic*
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
Phone: (601) 317-7519
Email: leslie.jones@splcenter.org
Email: andrea.alajbegovis@splcenter.org

*Pro hac vice* applications forthcoming

/s/ *Jennifer Vail*
Jennifer Vail*
Lucia Goin*
Southern Poverty Law Center
1101 17th Street NW, Suite 705
Washington, DC 20036
Phone: (201) 469-6455
Email: jennifer.vail@splcenter.org
Email: lucia.goin@splcenter.org

*Pro hac vice* applications forthcoming

*Counsel for Proposed Amicus Curiae Southern Poverty Law Center, Hispanic National Bar Association, and Asian Americans Advancing Justice – AAJC*

Submitted: December 20, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2023, a true and correct copy of the foregoing *Motion of Southern Poverty Law Center, Lawyers' Committee for Civil Rights Under Law, Hispanic National Bar Association, and Asian Americans Advancing Justice – AAJC for Leave to File Amicus Curiae Brief* was filed electronically with the Clerk of the Court for the United States District Court for the Northern District of Ohio, Eastern Division, and was thereby served upon counsel via operation of the Court's CM/ECF system pursuant to Local Rule 25.1(h).

December 20, 2023                    */s/* Jon M. Greenbaum

                                                                                                                Jon Greenbaum