IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Nathan Roberts** and **Freedom Truck Dispatch LLC**, on behalf of themselves and all others similarly situated, | Case No. 1:23-cv-01597 |
| Plaintiffs, | |
| v. | |
| **Progressive Preferred Insurance Company**; **Progressive Casualty Insurance Company**; **Circular Board Inc.**, | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS, COMPEL ARBITRTION, OR TRANSFER VENUE**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Issues to be Decided .............................................................................................. 1

Introduction ........................................................................................................... 1

Background ............................................................................................................. 2

Legal Standards ...................................................................................................... 4

Summary of Argument .......................................................................................... 5

Argument ................................................................................................................ 8

    I.      The plaintiffs have Article III standing to sue ............................................ 8

        A.    The Competition Contract's terms inflict an injury on otherwise-eligible businesses and business owners ............................................ 8

        B.    The plaintiffs alleged facts establishing all three elements of standing with respect to both forms of relief sought ........................................ 10

    II.    The defendants' Rule 12(b)(6) motions fail ............................................ 13

        A.    The grant program operates through contractual relationships ........... 14

        B.    The defendants have no First Amendment right to racially discriminate in grantmaking ................................................................................... 16

        C.    The defendants cannot prevail by characterizing their program as a valid affirmative-action program ............................................................... 20

        D.    Nathan Roberts has a personal claim against the defendants ............... 24

    III.    The Court should reject the defendants' motions to compel arbitration or transfer this case ................................................................................... 25

Conclusion ............................................................................................................ 28

Certificate of Compliance with Local Rule 7.1(f) ............................................... 29

Certificate of Service ........................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)............................................................................18, 19

*16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.,*
  727 F.3d 502 (6th Cir. 2013)....................................................................13

*American Alliance for Equal Rights v. Fearless Fund Management, LLC,*
  No. 1:23-CV-3424-TWT, 2023 WL 6295121 (N.D. Ga. Sept. 27, 2023) ................................................................................... *passim*

*American Alliance for Equal Rights v. Fearless Fund Management, LLC,*
  No. 23-13138, 2023 WL 6520763 (11th Cir. Sept. 30, 2023) ..................6, 17

*Amini v. Oberlin College,*
  440 F.3d 350 (6th Cir. 2006)..................................................................6, 14

*Anderson v. Charter Communications, Inc.,*
  860 F. App'x 374 (6th Cir. 2021) ..............................................................25

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................11

*In re: Automotive Parts Antitrust Litigation,*
  951 F.3d 377 (6th Cir. 2020)......................................................................25

*Babb v. Wilkie,*
  589 U.S. 399 (2020)..................................................................................20

*Bostock v. Clayton County,*
  590 U.S. 644 (2020)..............................................................................20, 21

*Brown v. Google LLC,*
  No. 4:20-CV-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023)...................................................................................................15

*City Trust & Savings Bank v. Schwartz,*
  39 N.E.2d 548 (Ohio Ct. App. 1940) ........................................................15

*Cleveland Branch, N.A.A.C.P. v. City of Parma*,
  263 F.3d 513 (6th Cir. 2001)............................................................................12

*Cleveland-Akron-Canton Advertising Cooperative v. Physicians Weight
  Loss Centers of America, Inc.*,
  922 N.E.2d 1012 (Ohio Ct. App. 2009) .........................................................25

*Comcast Corp. v. National Association of African-American Owned
  Media*,
  140 S. Ct. 100915 (2020)..........................................................................21, 22

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  6 F.4th 1247 (11th Cir. 2021) ..................................................................16, 17

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)........................................................................................8

*Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*,
  470 F.3d 827 (9th Cir. 2006) (*en banc*) .......................................................7, 23

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006).......................................................................................24

*Drulias v. 1st Century Bancshares, Inc.*,
  30 Cal. App. 5th 696 (2018) ..........................................................................27

*Fisher v. University of Texas at Austin*,
  570 U.S. 297 (2013).........................................................................................2

*Gentek Building Products, Inc. v. Sherwin-Williams Co.*,
  491 F.3d 320 (6th Cir. 2007)............................................................................4

*Gratz v. Bollinger*,
  539 U.S. 244 (2003).............................................................................9, 22, 23

*Howard v. City of Detroit*,
  40 F.4th 417 (6th Cir. 2022) ............................................................................4

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,
  Inc.*,
  515 U.S. 557 (1995).......................................................................................18

*Inner City Contracting, LLC v. Charter Township of Northville*,
  87 F.4th 743 (6th Cir. 2023) ..........................................................................14

*Intershop Communications v. Superior Court*,
    104 Cal. App. 4th 191 (2002) ..........................................................................27

*Johnson v. Transportation Agency, Santa Clara County*,
    480 U.S. 616 (1987) .......................................................................................20

*Kostelnik v. Helper*,
    770 N.E.2d 58 (Ohio 2002) ......................................................................14, 15

*McDonald v. Santa Fe Trail Transportation Co.*,
    427 U.S. 273 (1976) .......................................................................................20

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .......................................................................................20

*Michigan Custom Machines, Inc. v. AIT Worldwide Logistics, Inc.*,
    531 F. Supp. 3d 1208 (E.D. Mich. 2021) .......................................................27

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007) .........................................................................................2

*Parsons v. United States Department of Justice*,
    801 F.3d 701 (6th Cir. 2015) ...........................................................................4

*Preterm-Cleveland v. McCloud*,
    994 F.3d 512 (6th Cir. 2021) (*en banc*) ........................................................22

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .......................................................................................17

*Reynolds v. United States*,
    98 U.S. 145 (1878) .........................................................................................18

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019) .......................................................................................2

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .........................................................................................17

*Runyon v. McCrary*,
    427 U.S. 160 (1976) .......................................................................................19

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) .......................................................12, 14, 20, 26

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
    600 U.S. 181 (2023) ................................................................ *passim*

*Swallow v. Wells Fargo Bank, N.A.*,
    No. 1:23-CV-02094, 2024 WL 300702 (N.D. Ohio Jan. 26, 2024) ........................................................................................5

*Sylvester Material, Inc. v. John Carlo, Inc.*,
    No. 04-cv-7686, 2005 WL 1176054 (N.D. Ohio 2005) ................................27

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ..........................................................7, 17, 20

**Statutes**

42 U.S.C. §1981 ...................................................................... *passim*

42 U.S.C. §2000e-2 ....................................................................20

**Other Authorities**

Driving Small Business Forward with Progressive Commercial Insurance Terms and Conditions (2023), https://perma.cc/QU33-LQ6H...................................................24

Federal Rule of Civil Procedure 12 .........................................4, 5, 8, 13

Progressive, *Progressive Insurance Unveils Driving Small Business Forward Grant Program to Support Hispanic Entrepreneurs* (May 23, 2022), https://perma.cc/TUX8-NRKP....................................................9

## ISSUES TO BE DECIDED

1. Because Nathan Roberts is white, the defendants refuse to enter certain contracts with Roberts or his company, Freedom Truck Dispatch LLC. The defendants' refusal prevents Roberts and Freedom Truck Dispatch from competing for grants that the defendants sponsor. Do Roberts and Freedom Truck Dispatch have Article III standing to seek relief under 42 U.S.C. §1981 from the defendants' racially exclusionary refusal?

2. Section 1981 guarantees to everyone the "same right . . . to make and enforce contracts" without regard to race. Roberts and Freedom Truck Dispatch allege that the defendants refused to contract with them because of Roberts's race. Have they stated a claim for relief under §1981?

3. Section 1981 regulates conduct—it forbids racial discrimination in contracting. Does this content-neutral regulation violate the First Amendment's Speech Clause when it incidentally burdens a business's ability to communicate race-focused ideas through commercial conduct?

4. Can Roberts and Freedom Truck Dispatch be forced to arbitrate this case pursuant to an arbitration agreement in a contract that they never entered?

5. Should this case be transferred to the Northern District of California based on terms in a contract that there is no evidence the plaintiffs entered, and that is either inapplicable to civil-rights claims or unenforceable?

## INTRODUCTION

The defendants proudly boast about discriminating on the basis of race. *See* Defendant Circular Board Inc.'s Motion to Dismiss, ECF 35, ("CB Br.") at 1, 13–14, 19; Progressive Defendants' Motion to Dismiss, ECF 34, ("Progressive Br.") at 2, 3–4. Specifically, they boast of their efforts to make grants available only to businesses operated by minority individuals. They suggest that racial discrimination is the only way to address the ill effects of racial discrimination.

Yet "[r]acial discrimination is never benign," *Fisher v. University of Texas at Austin*, 570 U.S. 297, 330 (2013) (Thomas, J., concurring), and the "way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 748 (2007) (plurality). Regardless, the defendants' discrimination violates federal law, which prohibits racial discrimination in the "mak[ing] and enforc[ing] of contracts." 42 U.S.C. §1981(a). The defendants' grant program comprises two distinct contracts. Under the first, would-be applicants gain the right to compete for grant funds in exchange for, among other things, the right to use their personal information for marketing and other purposes. Under the second, those who win the relevant competition may accept the money contingent on their agreeing to additional terms. *Both* contracts are offered on racially exclusionary terms: only black-owned businesses and their officers are eligible to enter the contract to compete for the grant, and only black-owned businesses are eligible for the grant. These terms exclude white-owned companies like Freedom Truck Dispatch, and white people like owner-operator Nathan Roberts, from competing for grant funds.

The defendants now move to dismiss, arguing that the plaintiffs lack standing to sue and fail to state a claim for relief. They alternatively seek an order compelling arbitration or transfer to a new venue. The Court should deny their motions.

## BACKGROUND

Because this case remains at the motion-to-dismiss stage, the Court must "assume the truth of the facts alleged" in the "operative complaint." *Rotkiske v. Klemm*, 140 S. Ct. 355, 359 n.1 (2019).

**1.** This case concerns the legality of a racially exclusionary grant program. The program, dubbed the "Driving Small Business Forward" program, is the product of a collaboration between the defendants. Progressive offered this grant in conjunction

with Hello Alice, an online platform that Circular Board operates. (For simplicity and ease of exposition, we will use "Progressive" to refer to defendants Progressive Preferred Insurance Company and Progressive Casualty Insurance Company.) The program provides grants to fund small businesses' purchase of a commercial vehicle. First Amended Complaint (FAC), at ¶12, ECF 32.

Progressive and Hello Alice offer this grant on racially exclusionary terms. To apply, applicants must "[b]e a for-profit business majority (51%+) owned and operated by a Black-identifying entrepreneur(s)." *Id.* ¶18 (quoting FAC Exhibit 3). Other eligibility requirements are race-neutral. For example, companies must have "10 or fewer employees"; they must bring in "less than $5 [million] in annual gross revenue"; they must have a "demonstrated need for a qualifying commercial vehicle to run [a] business"; and they must have "a clear plan for growth as a result of [the] vehicle purchase." *Id.* (quoting FAC Exhibit 3). But the race-based requirement is the only one upon which Progressive and Hello Alice insist. *Id.* ¶20.

To obtain the grant, applicants must enter two agreements. Applicants must enter the first, call it the "Competition Contract," to compete for the grant. The price? Applicants—both the officer who applies and the company for which he applies—must accede to various terms and conditions, including terms giving Hello Alice and Progressive a license to use applicants' information for commercial purposes, such as cross-selling and marketing. *Id.* ¶21. Progressive and Hello Alice thus give the right to compete in exchange for acquiring the right to use the applicants' information.

Those who prevail in the competition for the grant enter a second contract, the "Final Grant." These winners obtain the money only by agreeing to other terms, including by agreeing to use the money to purchase a qualifying commercial vehicle. *Id.* ¶22.

**2.** Nathan Roberts is the sole owner and member of Freedom Truck Dispatch

LLC. *See id.* ¶10. On behalf of Freedom Truck Dispatch, Roberts obtained a commercial insurance policy from Progressive. *Id.* Last May, Progressive emailed Roberts about the grant. Roberts began filling out the form. Freedom Truck Dispatch and Roberts met all of the race-neutral qualifications for the grant. *Id.* ¶31 & Ex. 8. But Roberts is white, making him ineligible to enter the Competition Contract. Accordingly, Roberts did not complete the application after he came to the term requiring the relevant business to be black-owned. *Id.* ¶28

Roberts then filed this lawsuit, alleging that the defendants have violated and are violating 42 U.S.C. §1981, which forbids racial discrimination in the making and enforcement of contracts.

## LEGAL STANDARDS

*Rule 12(b)(1).* "Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Howard v. City of Detroit*, 40 F.4th 417, 422 (6th Cir. 2022) (quotation omitted). A facial attack challenges the sufficiency of the pleadings. Thus, when adjudicating such an attack, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Parsons v. United States Department of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quotation omitted).

Movants may also make a "factual attack" under Rule 12(b)(1). They do so by introducing evidence to raise "a factual controversy" regarding standing, which requires the district court to "weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Gentek Building Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

*Rule 12(b)(6).* "A Rule 12(b)(6) motion tests 'the plaintiff's cause of action as stated in the complaint,' and is 'not a challenge to the plaintiff's factual allegations.'"

*Swallow v. Wells Fargo Bank, N.A.*, No. 1:23-CV-02094, 2024 WL 300702, at *1 (N.D. Ohio Jan. 26, 2024) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005)). "When determining whether the plaintiff states a claim on which relief can be granted, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## SUMMARY OF ARGUMENT

The Court should deny the defendants' motions to dismiss under Rule 12, to compel arbitration, and to transfer venue.

**I.** Begin with the motions to dismiss for lack of standing under Rule 12(b)(1). This Court has standing if at least one plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (quotation omitted). Here, both Roberts and Freedom Truck Dispatch have made the requisite showing. But for Roberts's race, they would have been eligible to enter the Competition Contract to compete for a grant. The defendants' racial discrimination thus injured Roberts and Freedom Truck Dispatch, and will continue to injure them, by denying them the ability "to compete" for the grant "on equal footing" with others. *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, No. 1:23-CV-3424-TWT, 2023 WL 6295121, at *4 (N.D. Ga. Sept. 27, 2023). Whether they would ultimately have secured the grant is beside the point.

That establishes the injury-in-fact element. With respect to traceability, the plaintiffs' competitive injuries are directly traceable to the challenged discriminatory con-

duct. And their injuries are redressable: the past injuries would be redressed by a damages award, and the future injuries by an injunction barring further discrimination. Article III is satisfied.

**II.** Now consider the merits. "[T]o establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). The plaintiffs alleged that Roberts is white (satisfying the first element), that the defendants have and will continue to discriminate against him on that basis (satisfying the second), and that their doing so violated the §1981(a)-conferred right to be free from racial discrimination in the making and enforcement of contracts (satisfying the third).

Progressive and Hello Alice contend that Roberts and Freedom Truck Dispatch failed to allege the third element—they deny that the grant program involves any contracts. They stress that valid contracts require consideration, and they deny that grant participants give any. But that is incorrect. *All* participants, in exchange for the opportunity to apply for the grant, give the defendants the right to use their information for marketing and other business purposes. *See* FAC ¶21. Giving the defendants that legal right constitutes consideration as a matter of law.

The defendants' other merits arguments fare no better. For example, they contend that the First Amendment entitles them to discriminate without regard to §1981. Not so. Although "the First Amendment protects the defendants' right to promote beliefs about race, it does not give the defendants the right to exclude persons from a contractual regime based on their race." *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, No. 23-13138, 2023 WL 6520763, at *1 (11th Cir. Sept.

30, 2023) ("*Fearless Fund II*"). Section 1981 is a "permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Specifically, it forbids the conduct of racial discrimination in contracting. The defendants cannot evade this regulation of conduct simply by identifying some discriminatory message that the prohibited conduct conveys or that the prohibition incidentally burdens.

Finally, Hello Alice argues that the grant program can be sustained as a valid affirmative-action program. But there is no affirmative-action exception to §1981. Even if there were, Hello Alice "cites no authority applying the defense to a grant fund, rather than an employer." *Fearless Fund*, 2023 WL 6295121 at *7. And even if the defense applied to grant funds, it would not constitute a valid affirmative-action program. For example, whereas the defense applies only to programs that do not "unnecessary trammel the rights of members of the non-preferred class or create an absolute bar to their" participation, *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 470 F.3d 827, 840 (9th Cir. 2006) (*en banc*) (quotations and brackets omitted), the grant program is completely closed to, among others, white people and white-owned businesses.

**III.** That leaves only the defendants' efforts to resolve this case elsewhere. They first move to compel arbitration, noting that the grant program's terms contained an arbitration clause. But neither Roberts nor Freedom Truck Dispatch agreed to those terms; Roberts closed the grant application without agreeing to any terms upon learning that he and the company were ineligible for the grant. FAC ¶28; Ex. 1 to this Response; *see also* CB Br.11. Parties cannot be forced to arbitrate under arbitration clauses in contracts to which they never agreed.

Finally, Hello Alice (but not Progressive) moves to transfer this case to the United States District Court for the Northern District of California. It relies on a forum-selection clause related to terms and conditions it claims Roberts agreed to when he opened a Hello Alice account. But Hello Alice fails to establish that Roberts agreed

to these terms, and it does not even contend that Freedom Truck Dispatch agreed to them. Regardless, the forum-selection clause is best read not to apply to §1981 claims. So the Court should deny Hello Alice's motion to transfer.

## ARGUMENT

The defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). They alternatively moved for an order to force arbitration or to transfer venue. The Court should reject each request.

## I.    The plaintiffs have Article III standing to sue

The defendants' 12(b)(1) motions present the following question: Do plaintiffs have standing to challenge grant programs that deny them, on the basis of race, the ability "to compete on equal footing"? *Fearless Fund*, 2023 WL 6295121 at *4. Yes, they do. That defeats the defendants' Rule 12(b)(1) motions.

### A.    The Competition Contract's terms inflict an injury on otherwise-eligible businesses and business owners

Article III standing requires at least one plaintiff who "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Harvard*, 600 U.S. at 199 (quotation omitted). Plaintiffs "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quotation omitted). Here, the plaintiffs seek retrospective relief (damages) and prospective relief (an injunction). They alleged facts sufficient to establish their standing to seek both forms of relief.

***Injury in fact.*** The defendants injured Freedom Truck Dispatch and Roberts by denying them the ability to enter the Competition Contract based on Roberts's race. The alleged facts show that Freedom Truck Dispatch satisfied all race-neutral eligibility requirements. But it did not satisfy the race-based eligibility requirement because its owner and sole member, Roberts, is white. Thus, but for Roberts's race, he and

Freedom Truck Dispatch would have been eligible to enter the Competition Contract and to compete for the Final Grant. As a result, both suffered an "'injury in fact'"— namely, "the inability to compete on an equal footing in the [grant] process." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (quoting *Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993)); *accord Fearless Fund*, 2023 WL 6295121 at *4.

The lost ability to compete constitutes a past injury—one justifying the plaintiffs' request for retrospective relief. But it also constitutes an ongoing injury supporting a claim for prospective relief. The plaintiffs alleged that the defendants will continue offering racially exclusionary grants for which the plaintiffs will be denied the right to compete. *Id.* ¶24. And while those allegations rest on "information and belief," they are supported with exhibits showing Hello Alice's participation in similar programs, *id.* Exs. 6 & 7, and by the defendants' own motions to dismiss, which describe racially exclusionary grants as a charitable endeavor in which the companies are proud to participate. With respect to Progressive, the Court can take judicial notice of the company's statements advertising other race-based grant programs. *See, e.g.*, Progressive, *Progressive Insurance Unveils Driving Small Business Forward Grant Program to Support Hispanic Entrepreneurs* (May 23, 2022), https://perma.cc/TUX8-NRKP.

**Traceability.** If the facts alleged are true, then the plaintiffs sustained the just-discussed injury as a direct result of the racially discriminatory conduct the plaintiffs are challenging. It follows that the injury is "fairly traceable to the challenged conduct of the defendant." *Harvard*, 600 U.S. at 199 (quotation omitted).

**Redressability.** The past injury that the defendants sustained from the Competition Contract's discriminatory terms—the denial of their right to compete—will be redressed with monetary damages. Their ongoing injury—the inability to compete for future grants—will be redressed by an injunction forbidding the illegal conduct.

*

In sum, the defendants' conduct has injured and will continue to injure the plaintiffs. Their past injuries give them standing to seek retrospective relief. Their ongoing injuries confer standing to seek prospective relief.

### B.    The plaintiffs alleged facts establishing all three elements of standing with respect to both forms of relief sought

Standing is easiest to see when one realizes that the Driving Business Forward Program consists of two contracts—the Competition Contract and the Final Grant. As the foregoing shows, the plaintiffs were and will be injured by being excluded from entering the Competition Contract to compete on equal terms for the Final Grant.

The defendants largely ignore this aspect of the plaintiffs' case. Each of them insists, for example, that the plaintiffs failed to allege past injury because they did "not even attempt to allege . . . that Freedom Truck Dispatch would have been selected to receive one of the 10 grants awarded" in 2023. Progressive Br.8; *see also* CB Br.4–5. But this focuses on the wrong injury. Even assuming the plaintiffs would not ultimately have secured the Final Grant, they were *still* injured by the racially discriminatory terms in the Competition Contract. How? By being denied a right they would otherwise have had—namely, the right to *compete* for the Final Grant. As in *Fearless Fund*, the plaintiffs were injured by their "inability to compete on equal footing (and not their ultimate inability to obtain the grant)." 2023 WL 6295121 at *4.

Perhaps sensing this, the defendants try denying that Roberts and Freedom Truck alleged facts sufficient to establish their ability to satisfy the race-neutral eligibility criteria. *See* Progressive Br.10; CB Br.5–6. On this basis, they argue that the plaintiffs failed to allege an injury in fact traceable to the race-based eligibility requirement they challenge. But the operative complaint specifically alleges that "Roberts's business, Freedom Truck Dispatch, satisfied all of the purported eligibility requirements except

for the requirement that the applicant be a black-owned business." FAC ¶31. An attached declaration, *see id.*, Ex. 8, elaborates:

a. Freedom Truck Dispatch LLC had fewer than 10 employees and less than $5 million in annual gross revenue;

b. Freedom Truck Dispatch LLC had a demonstrated need for a qualifying commercial vehicle and a clear path for growth as a result of the vehicle purchase;

c. Neither [Roberts], nor Freedom Truck Dispatch LLC, were independent contractors for any rideshare service or third-party food-delivery service; and

d. [T]he grant money would be used for a commercial vehicle with a "Gross Vehicle Mass" (GMV) under 26,000 lbs and would not be a vehicle designed for use off public roads or heavy equipment (such as a bulldozer, farm machinery, forklift, etc.)

The defendants gripe about the plaintiffs' failure to allege *even more* specifically that they satisfied the race-neutral factors—perhaps by stating precisely how many employees the company has, precisely how much revenue it raised, or precisely how the additional truck would create a clear path for growth, *see* Progressive Br.10. But they identify no case demanding such specificity. That is because none does; our notice-pleading regime does not require "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). If the facts alleged are true, then the plaintiffs' inability to compete for the Final Grant is an injury in fact traceable to the challenged, race-based eligibility requirement. The plaintiffs need not allege anything further.

Finally, the defendants argue that the plaintiffs lack standing to seek *prospective* relief regardless of whether they can seek retrospective relief. Their arguments fail.

Progressive, for its part, disclaims any intention to "sponsor future grants that include race- or other-demographic-based eligibility criteria." Progressive Br.11 (citing Decl. of Gargi Patel Duirk ¶¶5–7, ECF 34-1). While Progressive couches this

argument in terms of standing, the company is really arguing that the request for prospective relief against it has become moot. "[S]tanding concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct was occurring at the time the complaint was filed, while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 525 (6th Cir. 2001) (quotation and citation omitted). Progressive suggests that because it will no longer offer race-based grants, the plaintiffs no longer have an interest in enjoining the company from offering such grants.

The Court should reject this mootness argument. The declaration on which Progressive relies asserts that Progressive had "already begun planning for the 2024 Program to be demographic-neutral" when the plaintiffs sued, Duirk Decl. ¶6, and that it has since definitively adopted that plan. But Progressive's decision to cease offering race-based grants in a single grant cycle does not moot the request for prospective relief. "Voluntary cessation of the alleged illegal conduct does not, as a general rule, moot a case." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). It will do so only if there is "no reasonable expectation that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. (quotation omitted). The party arguing mootness bears a "heavy" burden. *Id*. (quotation omitted). Progressive has not carried that burden. The cited declaration promises that Progressive will not discriminate based on race in this upcoming grant cycle, but stops short of confirming that it will never again do so. Given Progressive's history of race-based grants, and given the evident pride it takes in having issued such grants, the declaration falls well short of establishing that there is "no reasonable expectation that the alleged violation will recur." *Id*. (quotation omitted).

Progressive's argument fares no better when viewed through the lens of standing.

The relied-upon declaration describes the declarant's "intended plan" to use race-neutral criteria in 2024. Duirk Decl. ¶5. But it fails to show that, before the plaintiffs sued on August 16, 2023, Progressive had definitely—let alone permanently—foresworn the issuance of race-based grants.

Even if Progressive could show that the plaintiffs lacked standing to seek prospective relief *against Progressive*, the claims for prospective relief against Hello Alice would remain, as that company openly intends to continue issuing racially exclusionary grants. In resisting this conclusion, Hello Alice stresses that the plaintiffs relied "on information and belief" when they alleged that Hello Alice "plan[s] to offer" the Driving Business Forward and similar racially exclusionary grants in the future. FAC ¶32. Hello Alice cites a Sixth Circuit case for the proposition that "information and belief allegations 'contribute nothing' to a complaint." CB Br.8 (quoting *16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013)). But that is not what the case says; it says that *conclusory* allegations are insufficient to defeat a Rule 12 motion. *16630 Southfield*, 727 F.3d at 506. The allegations here are not conclusory. Rather, the plaintiffs specifically alleged facts that Hello Alice (and Progressive) will follow a particular course of action in the future, continuing to offer grants for which only businesses run by non-whites are eligible. FAC ¶32. Especially given the exhibits attached to the complaint, which illustrate the defendants' commitment to supporting such initiatives, *see, e.g.*, *id.* at Exs. 2 & 4 (discussing the grant program's motivation), the allegations are far from conclusory.

## II.   The defendants' Rule 12(b)(6) motions fail

"[T]o establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct

abridged a right enumerated in section 1981(a)." *Amini*, 440 F.3d at 358.

The plaintiffs alleged each element. *First*, they alleged that Roberts is white. And while Freedom Truck Dispatch is a limited liability company, the Sixth Circuit permits it to raise a §1981 claim based on discrimination it experienced because of its owner's race. *Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743, 752–53 (6th Cir. 2023). *Second*, the plaintiffs alleged that the defendants discriminated against the plaintiffs based on Roberts's race; but for his race, the plaintiffs could have entered the Competition Contract and competed for the Final Grant on equal footing with others. *Finally*, the plaintiffs alleged that the defendants' discriminatory conduct abridges a right enumerated in §1981(a). That section enumerates the right "to make and enforce contracts," *id.*, which broadly "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," §1981(b). If the facts alleged are true, Roberts's race was the but-for cause of the plaintiffs' inability to enter the Competition Contract to compete for the Final Grant on equal footing.

From all this, it follows that the plaintiffs alleged a plausible claim for relief under §1981. The defendants raise a variety of counterarguments. None succeeds.

### A. The grant program operates through contractual relationships

The defendants' first-line defense is to insist that the Driving Business Forward program does not involve any contracts and that, as a result, their discriminatory conduct does not abridge rights protected by §1981(a). In essence, they claim that the grant is a non-contractual gift.

The Court should reject this argument. As the defendants acknowledge, Ohio law determines whether the grant program involves contractual agreements. *See* Progressive Br.13; CB Br.9. And under Ohio law, a contract constitutes "a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 770 N.E.2d 58, 61

(Ohio 2002) (quotation omitted). "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Id*. (quotation omitted).

The defendants home in on the consideration element; they deny that those who entered the Competition Contract or accepted the Final Grant conferred any legal benefit on the defendants or assumed any legal detriment. *See* Progressive Br.13–14; CB Br.9–11. In fact, however, every business and officer that entered the Competition Contract, and every business or officer that accepted the Final Grant, agreed to let the defendants use their information for marketing and other purposes. *See* FAC ¶21. Those who entered the Competition Contract or accepted the Final Grant thus conferred a meaningful legal benefit on the defendants. Hello Alice and Progressive gained access to, and the right to use, information otherwise inaccessible to them. That constitutes consideration as a matter of law, as it entails the "acquisition of some legal right" by Hello Alice and Progressive. *City Trust & Savings Bank v. Schwartz*, 39 N.E.2d 548, 555 (Ohio Ct. App. 1940). Indeed, it is the same consideration that forms a contract between online companies (like Google) and the users who give the companies access to their data in exchange for the right to use the companies' services. *See Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *13 (N.D. Cal. Aug. 7, 2023).

In sum, both applicants and the defendants gained something of value from the Competition Contract and the Final Grant. That distinguishes this case from cases involving a "conditional gratuitous promise." CB Br.9. Those promises arise only when one side to the transaction gains nothing, such as when "a rich man offer[s] to a poor man that, if the poor man would go around the corner to a clothing store, the rich man would permit him to buy a coat on his credit." *Id*. (alteration in original) (quotation omitted). It is perhaps true that "[a]llowing Hello Alice and Progressive

to make limited use of information submitted during the grant process is no more onerous than the walk to the store." *Id*. at 10. But the question is not whether those who accept the terms do something difficult; the question is whether they give Hello Alice and Progressive something of value. They do, as explained above. Neither the Competition Contract nor the Final Grant is a "conditional promise[] to give something," *id*., but rather an exchange of one right (the right to compete for or receive the grant) for another (the right to use the applicants' and winners' information for marketing and other purposes).

### B. The defendants have no First Amendment right to racially discriminate in grantmaking

**1.** The defendants additionally argue that their racial discrimination is expressive and thus protected by the First Amendment. The argument starts from the uncontroversial premise that, at least in some circumstances, "donating money qualifies as expressive conduct." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) (cited by CB Br.14). The defendants say that the Driving Small Business Forward program qualifies as expressive because it involves "'some form of expression' regarding racial inequities, and the vital importance of remedying those problems." CB Br.14 (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000)). Applying §1981 to these "donations," the defendants say, would unconstitutionally abridge their free-speech rights.

The consequences of accepting this argument are shocking. Racists always express a message when they discriminate. The neo-Nazi who opens a business and refuses to enter contracts with black-owned suppliers, for example, is expressing his disdain for black people. Is that activity constitutionally protected, and thus immune from state or congressional regulation? Accepting the defendants' argument would seem to compel an affirmative answer.

Thankfully, the defendants' argument contradicts binding Supreme Court precedent, which recognizes that §1981 is a "permissible content-neutral regulation of conduct." *Mitchell*, 508 U.S. at 487. Section 1981 regulates discrimination (which is conduct) in the context of contracting (also conduct). "Where," as here, "the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). That is why the neo-Nazi in the hypothetical above is bound by §1981. And it is why the defendants can claim no immunity from §1981. The statute, as applied here, regulates their discriminatory contracting practices, which qualify as conduct. To quote the only circuit to have considered the issue, although "the First Amendment protects the defendants' right to promote beliefs about race, it does not give the defendants the right to exclude persons from a contractual regime based on their race." *Fearless Fund II*, 2023 WL 6520763 at *1.

**2.** The defendants' arguments are largely red herrings. They first attempt to characterize their race-based contracts as charitable donations. This would be a different case if that characterization held water. "Donating money qualifies as expressive conduct" in some circumstances, *Coral Ridge*, 6 F.4th at 1254, and applying §1981 to curtail or compel expressive conduct would trigger strict scrutiny under the Speech Clause. But again, the facts alleged establish that the defendants are not simply donating money. Instead, they are selling a chance to compete for grants in exchange for the participants' information and the right to use that information for commercial gain. In other words, any "expressive component of" their "actions is not created by the conduct itself but by the speech that accompanies it." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). Progressive and Hello Alice's desire to pair their speech with prohibited conduct gives them no right, under the Speech Clause, to evade content-neutral regulations of that conduct. *Id.*

Next, the defendants quote out-of-context excerpts from cases recognizing, for example, that the First Amendment prohibits the government from "interfer[ing] with the ideas that [an] organization" seeks "to express," CB Br.17 (quoting *Boy Scouts of America* , 530 U.S. at 657), "modify[ing] the content of [a] donor's speech," *id.* (quoting *Coral Ridge*, 6 F.4th at 1256), or "deny[ing] speakers the right to choose the content of their own messages," *id.* (alterations accepted) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023)). Those principles are valid, but they apply when the government directly restricts or compels speech, such as by forcing a business owner to design a website celebrating marriages she morally opposes, *303 Creative*, 600 U.S. 570, or forcing a parade organizer to host floats spreading a message he opposes, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995). They do not apply to content-neutral regulations of commercial conduct that burden expression only incidentally. To hold otherwise would "in effect[] permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

Tellingly, the defendants offer no limiting principle for their rule that laws regulating business practices are constitutionally suspect as applied to all commercial acts linked to the promotion of an idea. They hang their hat primarily on *303 Creative*, but that case does not get them where they need to go. There, a designer of wedding websites sued to enjoin the application of Colorado's antidiscrimination law to her wedding-website business: she argued that forcing her to produce wedding websites for same-sex marriages would unconstitutionally compel her to espouse ideas with which she disagreed. 600 U.S. at 580. The Supreme Court held that this application of Colorado's law would violate the First Amendment. No doubt, the law in question was, on its face, a content-neutral regulation of commercial conduct; it required all businesses to provide their services to customers without regard to the customers' sexual orientations. *Id.* at 635–36 (Sotomayor, J., dissenting). But the petitioner's

business engaged in "pure speech," as its websites consisted of original, custom-made writings regarding the nature of marriage and the story of each betrothed couple. *Id.* at 587 (majority) (quotation omitted). Applying the content-neutral law to compel such speech constituted a direct, rather than incidental, burden on speech. As the Court recognized, "there is nothing 'incidental' about an infringement on speech when a public accommodations law is applied 'peculiar[ly]' to compel expressive activity." *Id.* at 600 n.6 (alteration in original) (quoting *Hurley*, 515 U. S. at 572). That logic is inapplicable here, because §1981 does not compel the defendants to say or refrain from saying anything. It merely prohibits them from *doing* something: namely, from discriminating on the basis of race.

All of this accords with *Runyon v. McCrary*, 427 U.S. 160 (1976), which held that §1981 prohibits private schools from excluding black students and rejected an argument that §1981 violates the First Amendment rights of segregationist parents. *Id.* at 176. Even "assum[ing] that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable," the Court held, "it does not follow that the practice of excluding racial minorities from such institutions is also protected by the same principle." *Id. Runyon* thus establishes that the government can regulate discriminatory *conduct* even when doing so incidentally burdens individuals' First Amendment rights.

Rather shockingly, Hello Alice insists that *Runyon* leaves segregationists with substantial room to evade its holding. Hello Alice claims that, because "the segregation policy at issue in *Runyon* simply did not implicate the" First Amendment, the Court "did not consider how to handle a conflict between First Amendment-protected conduct and a public accommodation law." CB Br.17. Thus, according to Hello Alice, the segregationist schools might have prevailed if only they had identified expressive conduct that integrated admissions would incidentally burden. That is absurd. Schools have a right to engage in racist speech. But they have no right to ignore "content-

neutral regulation of conduct" that burdens such speech. *Wisconsin*, 508 U.S. at 487. The same goes for Hello Alice.

### C. The defendants cannot prevail by characterizing their program as a valid affirmative-action program

Hello Alice, but not Progressive, defends its discriminatory practices as an affirmative-action program. To no avail.

By way of background, Title VII of the Civil Rights Act of 1964 forbids employers to discriminate against employees or applicants "because of [their] race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court adopted a burden-shifting analysis for enforcing this language. Under this framework, "[o]nce a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision." *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 626 (1987). According to *Johnson*, the "existence of an affirmative action plan provides such a rationale." *Id.*; *but see Babb v. Wilkie*, 589 U.S. 399, 405 (2020) ("[A]s for 'discrimination,' . . . its normal definition . . . is 'differential treatment.'" (citation and some internal quotation marks omitted)); *Bostock v. Clayton County*, 590 U.S. 644, 657 (2020) ("What did 'discriminate' mean in 1964? As it turns out, it meant then roughly what it means today: 'To make a difference in treatment or favor (of one as compared with others).'" (quoting *Webster's New International Dictionary* 745 (2d ed. 1954)).

Hello Alice urges the Court to extend the rationale of *Johnson* by deeming the Driving Small Business Forward program a permissible "affirmative action plan" under §1981. But that argument faces no fewer than four insuperable obstacles.

*First*, the court-created affirmative-action defense does not apply to §1981 claims. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 287 (1976) ("[W]e

cannot accept the view that the terms of § 1981 exclude its application to racial discrimination against white persons."). The defense is an atextual exception to Title VII, which *forbids* employers to make employment decisions "because of" race. Affirmative-action programs run afoul of this prohibition by giving an advantage to individuals of one race, thereby disadvantaging others. In every instance where that disadvantage proves dispositive—every time an affirmative-action program causes an employer to hire or promote one employee rather than another—the disadvantaged employee experiences discrimination "because of" his race. The affirmative-action defense is thus impossible to reconcile with the text of Title VII. That is perhaps why the EEOC's *amicus* brief, despite arguing that "Title VII permits employers to adopt voluntary affirmative-action plans to remedy manifest imbalances in their workforces," makes no attempt to square the defense with Title VII's text. EEOC Amicus Br.2, ECF 38-1. In addition to contradicting Title VII's text, the defense is increasingly impossible to reconcile with Title VII case law, which interprets the statute to flatly forbid differential treatment that is the but-for result of an employer's considering a protected characteristic like race. *See Bostock*, 590 U.S. 644; *Comcast Corp. v. National Association of African-American Owned Media*, 140 S. Ct. 1009, 1014–15 (2020). The reconciliation is even harder because of recent cases from other contexts recognizing that affirmative-action programs are inherently racially discriminatory. *See Harvard*, 600 U.S. at 218–21.

There is no sound basis for *extending* the affirmative-action defense—which appears to be on its last legs even in the Title VII context—to §1981 suits. Section 1981's text is no more consistent with affirmative action than is the text of Title VII; §1981 commands equal treatment, and thus forbids affirmative action, by guaranteeing "[a]ll persons . . . the same right . . . to make and enforce contracts." §1981(a). As the Supreme Court recently explained:

> The guarantee that each person is entitled to the "same right . . . as is enjoyed by white citizens" directs our attention to the counterfactual—what would have happened if the plaintiff had been white?. . . . If the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the "same" legally protected right as a white person. Conversely, if the defendant would have responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right as a white person.

*Comcast*, 140 S. Ct. at 1015 (first ellipsis in original). That proves dispositive. When it is "dubious whether a precedent is correct as an original matter," lower courts must "tread carefully before extending it." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 543 (6th Cir. 2021) (*en banc*) (Bush, J., concurring) (quotation omitted). The affirmative-action defense is not just dubious; it is *wrong* as an original matter. Thus, "the rule of law … dictate[s] confining the precedent, rather than extending it" into a new context. *Id.* (quotation omitted). Hello Alice observes that other circuits have failed to heed this advice, extending the affirmative-action defense to §1981 suits. CB Br.19. So they have. But this Court is not bound by those decisions, all of which predate and contradict the decision in *Comcast*. This Court ought not repeat their error.

Indeed, repeating the error would contradict *Gratz v. Bollinger*, which observed that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981," provided (of course) that it occurs in the making or enforcement of contracts. 539 U.S. 244, 276 n.23 (2003). Affirmative-action programs administered by state and local governments violate the Equal Protection Clause, except in the vanishingly small number of situations in which such programs satisfy strict scrutiny. *See Harvard*, 600 U.S. at 218–22. That means such programs also violate §1981 when used in the making or enforcement of contracts. The EEOC insists *Gratz* does not mean what it says. The "*Gratz* Court," according to the EEOC, "was referring to the fact that both the Equal Protection Clause and

section 1981 prohibit only purposeful discrimination and do not separately provide for disparate-impact liability." EEOC Amicus Br.9. The Ninth Circuit has offered the same interpretation. *Kamehameha Schools*, 470 F.3d at 839. But that interpretation is nonsensical. The quoted language appears in a footnote to the following sentence: "We further find that the admissions policy also violates [in addition to the Equal Protection Clause] Title VI and 42 U.S.C. § 1981." *Gratz*, 539 U.S. at 275–76. The footnote then explains that conduct that violates the Equal Protection Clause will also violate these statutes in the contexts where they apply. *Id*. at 276 n.23. In other words, the footnote justifies the conclusion that, because the challenged admissions policy violates the Equal Protection Clause, it also violates §1981. Neither the footnote nor the language linking the Equal Protection Clause and §1981 can fairly be read as addressing the relevance of disparate-impact evidence.

*Second*, presumably because the affirmative-action defense comes from the employment context, Hello Alice "cites no authority applying the defense to a grant fund, rather than an employer." *Fearless Fund*, 2023 WL 6295121 at *7. Nor does it advance any argument for extending the defense to this context. Tellingly, the EEOC's amicus brief refrains from taking any position on whether grant programs in general, or this grant program in particular, qualify as affirmative-action programs. If they did, or if they could, the EEOC would say so.

*Third*, even where the affirmative-action defense applies, a valid affirmative-action program "must not unnecessarily trammel the rights of members of the non-preferred class or create an absolute bar to their" obtaining the opportunity to which the program applies. *Kamehameha Schools*, 470 F.3d at 840 (quotations and brackets omitted); *accord* EEOC Br.5–6. The challenged school-admission policy in *Kamehameha Schools*, for example, was held to pass muster because it gave a preference to students of Hawaiian ancestry without absolutely barring others from gaining admission. *Id*. at 845. The defendants' grant program, in contrast, is entirely closed to white-owned

businesses like Freedom Truck Dispatch. That constitutes the sort of "absolute bar" that invalidates affirmative-action programs.

*Finally*, affirmative-action programs "must do no more than is necessary" to correct the racial imbalance toward which they are directed. *Id.*; *see also* EEOC Br.6. Here, the challenged program categorically bars *any* non-blacks from competing for grants. That at least presents a factual dispute whether the challenged program does more than is necessary. *See Fearless Fund*, 2023 WL 6295121 at *7. And the Court cannot resolve that factual question at the pleading stage.

> **D.    Nathan Roberts has a personal claim against the defendants**

A "plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006). Progressive argues that only Freedom Truck Dispatch would have had any rights under the contracts. Therefore, only Freedom Truck Dispatch may bring a §1981 claim. *See, e.g.*, Progressive Br.15–16 (citing *Edwards v. Woodforest National Bank*, No. 1:11 CV 2205, 2012 WL 1906309, at *10 (N.D. Ohio 2012)).

This argument fails because Roberts would have had rights under the Competition Contract if he were not denied the right to contract on account of his race. The Competition Contract required *both* the "Entrant" (the business) and the "Officer" (the business owner, for example) to give the defendants the right to use their information. *See* Driving Small Business Forward with Progressive Commercial Insurance Terms and Conditions (2023), https://perma.cc/QU33-LQ6H (link included in FAC, Ex. 4). And *both* the Entrant and the Officer obtained certain rights (such as the right to arbitrate certain disputes). *Id.* Because the defendants would have obtained Roberts's information for commercial gain and because Roberts would have rights under the Competition Contract had he been allowed to enter it, he has a

§1981 claim based on the defendants' denying him the right to do so.

## III. The Court should reject the defendants' motions to compel arbitration or transfer this case

Finally, the defendants move to resolve this dispute elsewhere. They first suggest that the case should be arbitrated because the Competition Contract contains an arbitration clause. But neither Roberts nor Freedom Truck Dispatch is bound by the Competition Contract (or the Final Grant) because Roberts never entered the Competition Contract; he stopped the application once he realized he was ineligible. *See* FAC ¶28 and Ex. 1 to this Response.

The defendants know this, but claim that Roberts and Freedom Truck Dispatch are nevertheless bound by the arbitration agreement under the doctrine of estoppel. This argument borders on frivolous. "Estoppel applies when a party who knowingly accepts the benefits of an agreement is estopped from denying a corresponding obligation to arbitrate." *Cleveland-Akron-Canton Advertising Cooperative v. Physicians Weight Loss Centers of America, Inc.*, 922 N.E.2d 1012, 1016 (Ohio Ct. App. 2009) (quoted by CB Br.11.). Here, neither Roberts nor Freedom Truck accepted the benefits of any agreement containing a corresponding obligation to arbitrate. Indeed, the entire point of the suit is that they were denied the opportunity to accept those benefits because of Roberts's race.

The defendants respond that "the question of whether equitable estoppel binds the Plaintiffs is itself a question for the arbitrator, not the Court." CB Br.12. Wrong. Courts cannot compel parties to arbitrate an agreement they never entered. For that reason, courts "must decide whether the parties actually entered into an arbitration agreement before sending the dispute to arbitration." *Anderson v. Charter Communications, Inc.*, 860 F. App'x 374, 377 (6th Cir. 2021) (collecting cases); *accord In re: Automotive Parts Antitrust Litigation*, 951 F.3d 377, 382–83 (6th Cir. 2020). Because neither Roberts nor Freedom Truck Dispatch agreed to the contract, neither is

bound by the arbitration clause it contains.

Next, Hello Alice argues that, if "the Court does not compel arbitration, at a minimum it should enforce the forum selection clause Roberts agreed to when he created an account with Hello Alice." CB Br.13. Wrong again, for three reasons.

*First*, Hello Alice never even argues that Freedom Truck Dispatch, who Progressive elsewhere argues is the only proper plaintiff, is bound by these terms. Nor does it explain why it would be proper to transfer a case based on a supposed agreement between one of two plaintiffs and one of three defendants.  In any event, Hello Alice identifies no evidence that even Roberts agreed to those terms. Its exhibits include a contract with a forum-selection clause, evidence that Roberts started an account, and evidence that Hello Alice's website at some unspecified time (perhaps February 3, 2024) included a sign-up page at which users agreed to unspecified "Terms of Use." *See* CB Br. Exs. 2–4. But it provides no record of *Roberts*'s agreeing to these terms. Indeed, it provides no evidence regarding how Roberts opened his account, and thus fails to show that Roberts ever agreed to the terms in question.

*Second*, the forum-selection clause does not govern this civil-rights case. It states: "You expressly agree that exclusive jurisdiction for resolving any claim or dispute with us or relating in any way to your use of the Platform or the Services resides in the state and federal courts of Sonoma County, California." *Id*. at Ex.3. That language most naturally encompasses disputes arising out of the contractual relationship, not out of Hello Alice's *refusal* to form a contractual relationship. To be sure, the phrase "any claim or dispute with us" is broad. *Id*. But that phrase is followed by another phrase ("or relating in any way to your use of the Platform or the Services", *id*.) that would be superfluous if the first phrase really did capture literally every dispute with Hello Alice, no matter how disconnected from the breach or performance of contractually guaranteed duties. Thus, the "any claim or dispute with us" language is best read to apply only to disputes involving Hello Alice's provision of services. This suit

challenging their refusal to even enter the contract does not fit the bill. At bare minimum, there is a good-faith dispute regarding the clause's applicability, which weighs against transfer. *See Sylvester Material, Inc. v. John Carlo, Inc.*, No. 04-cv-7686, 2005 WL 1176054, *4 (N.D. Ohio 2005); *Michigan Custom Machines, Inc. v. AIT Worldwide Logistics, Inc.*, 531 F. Supp. 3d 1208, 1217–18 (E.D. Mich. 2021)

*Finally*, and in light of the just-concluded discussion, the forum-selection clause fails to give adequate notice that those who enter it are agreeing to litigate in California *all* claims against Hello Alice, including federal civil-rights claims relating to the refusal to form a contract. That proves significant, because the contract on which Hello Alice relies says that "the laws of the state of California, excluding its conflicts-of-law rules, shall govern these Terms." In the Golden State, a "forum selection clause within an adhesion contract"—a contract, like this one, offered on a take-it-or-leave it basis—is unenforceable unless "the clause provide[s] adequate notice to the [party] that he [i]s agreeing to the jurisdiction cited in the contract." *Intershop Communications v. Superior Court*, 104 Cal. App. 4th 191, 201–02 (2002) (alteration in original) (citation omitted). Such clauses are thus unenforceable when they fall "outside the reasonable expectations of the weaker or adhering party." *Drulias v. 1st Century Bancshares, Inc.*, 30 Cal. App. 5th 696, 708 (2018) (quotation omitted). Because the quoted language can reasonably be read not to govern civil-rights litigation based on Hello Alice's refusal to enter a contract, it fails to provide the requisite notice and falls outside consumers' reasonable expectations. The forum-selection clause would thus be unenforceable under California law if read to demand a particular forum for §1981 claims. And the clause cannot naturally be read in a way that would render it unenforceable under the state law that governs the contract's terms.

## CONCLUSION

The defendants' motions to dismiss, and their alternative requests to compel arbitration or transfer venue, should be denied.

Respectfully submitted.

Jonathan F. Mitchell*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Gene P. Hamilton*
Virginia Bar No. 80434
Vice-President and General Counsel
Nicholas R. Barry*
Senior Litigation Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
nicholas.barry@aflegal.org

*admitted *pro hac vice*

Dated: March 22, 2024

 /s/ Benjamin M. Flowers 
Benjamin M. Flowers
Ohio Bar No. 0095284
Joseph P. Ashbrook
Ohio Bar No. 0091279
Julie E. Byrne
Ohio Bar No. 0085174
Ashbrook Byrne Kresge LLC
Post Office Box 8248
Cincinnati, Ohio 45249
(513) 582-7424 (phone)
(513) 216-9882 (fax)
jpashbrook@ashbrookbk.com
jebyrne@ashbrookbk.com
bflowers@ashbrookbk.com

*Counsel for Plaintiffs and
the Proposed Class*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I certify that this case has not yet been assigned a track and the brief complies with the page limitations set forth in Local Rule 7.1(f). The brief is under 30 pages and thus complies with this Court's February 28, 2024 order modifying the other-wise-applicable page limits.

 /s/ Benjamin M. Flowers 
BENJAMIN M. FLOWERS
*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that on March 22, 2024, I served this document through CM/ECF upon:

MICHAEL J. RUTTINGER
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
(216) 696-4456 (phone)
(216) 592-5009 (fax)
michael.ruttinger@tuckerellis.com

STEPHANIE SCHUSTER
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 373-6595 (phone)
(202) 739-3001 (fax)
stephanie.schuster@morganlewis.com

EMILY CUNEO DESMEDT
Morgan, Lewis & Bockius LLP
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6673
(877) 432-9652
emily.desmedt@morganlewis.com

HANNA E. MARTIN
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6716
(212) 309-6000
hanna.martin@morganlewis.com

*Counsel for Defendants Progressive
Preferred Insurance Company and
Progressive Casualty Insurance Company*

MICHAEL N. UNGAR
DOLORES GARCIA
HALDEN R. SCHWALLIE
Ub Greensfelder LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1406
(216) 583-7000 (phone)
(216) 583-7001 (fax)
mungar@ubglaw.com
dgarcia@ubglaw.com
hschwallie@ubglaw.com

NEAL KUMAR KATYAL
DAVID M. FOSTER
REEDY C. SWANSON
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
david.foster@hoganlovells.com
reedy.swanson@hoganlovells.com

*Counsel for Circular Board Inc.*

 /s/ Benjamin M. Flowers 
BENJAMIN M. FLOWERS
*Counsel for Plaintiffs and the Proposed Class*